**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| DEBRA D. HANIGAN, individually, and a representative of a Class of Participants and Beneficiaries of the Bechtel Trust and Thrift Plan, <br><br> Plaintiff, <br><br> v. <br><br> BECHTEL GLOBAL CORPORATION, BOARD OF DIRECTORS OF BECHTEL GLOBAL CORPORATION, and BECHTEL TRUST & THRIFT PLAN COMMITTEE <br><br> Defendants. | Case No: <br><br> **CLASS ACTION COMPLAINT FOR CLAIMS UNDER ERISA, 29 U.S.C., § 1132(a)(2)** |

---

## CLASS ACTION COMPLAINT

---

COMES NOW Plaintiff, Debra D. Hanigan ("Plaintiff"), individually and as a representative of a Class of Participants and Beneficiaries of the Bechtel Trust and Thrift Plan (the "Plan" or "Bechtel Plan"), by her counsel, WALCHESKE & LUZI, LLC, and FITZGERALD HANNA & SULLIVAN, PLLC, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

### **INTRODUCTION**

1.    As the Fourth Circuit has maintained, "[t]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are ... the highest known to the law." *Tatum v. RJR Pension Inv. Comm.,* 761 F.3d 346, 356 (4th Cir. 2014).

1

2.     Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

3.     The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 575 U.S. at 529; *DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 423 (4th Cir.2007) ("The duty of a fiduciary to act with prudence includes a duty to initially determine, and continue to monitor, the prudence of each investment option available to plan participants.").

4.     This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern Univ.*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*").

5.     Plan fiduciaries have a continuing duty to monitor their 401(k) Plan fees to make sure that they are not excessive with respect to the services received. *See DiFelice*, 497 F.3d at 423.

6.     Although "a fiduciary need not constantly solicit quotes for [such] services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other

means—may violate their duty of prudence." *Hughes v. Northwestern Univ.*, 63 F.4th 615, 625-626 (7th Cir. 2023).

7.      ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Plan fees based on what is *reasonable* (not the cheapest or average) in the applicable market.

8.      There is no requirement to allege the actual inappropriate fiduciary actions taken because "[i]t would be perverse to require plaintiffs bringing [ERISA] claims to plead facts that remain in the sole control of the parties who stand accused of wrongdoing." See *Braden v, Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

9.      Defendants, Bechtel Global Corporation ("Bechtel"), the Board of Directors of Bechtel Global Corporation ("Board"), and the Bechtel Trust & Thrift Plan Committee ("Plan Committee") (collectively "Defendants"), are fiduciaries under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* as they exercise discretionary authority or discretionary control over the 401(k) defined contribution retirement plan – known as the Bechtel Trust and Thrift Plan (the "Plan" or "Bechtel Plan") – that it sponsors and provides to its employees.

10.     Bechtel and its Board are the Plan Sponsor of the Plan.

11.     Bechtel and its Board assigned Plan administrator fiduciary duties to the Bechtel Trust & Thrift Plan Committee ("Plan Committee") and its individual members

12.     Plaintiff is a "participant" in the Bechtel Plan under ERISA Section 3(7), 29 U.S.C. § 1002(7).

13.     During the Class Period (May 24, 2018, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1)(B) by

requiring Plan participants to pay excessive administrative fees to the Plan recordkeeper, Great-West/Empower ("Empower"), by automatically enrolling employees into a managed account ("MA") program that was set up as the Plan qualified default investment alternative ("QDIA") without a reasonable fiduciary process.

14.    Plaintiff also alleges that Defendants Bechtel and its Board violated their fiduciary duty of prudence by failing to monitor the fiduciaries responsible for Plan administrative fees on the Plan Committee.

15.    Without additional personalization of information from Plan participants, managed accounts are essentially expensive target-date funds, focused on the single demographic factor of age.

16.    Setting up MAs as the QDIA, significantly and imprudently increases the administrative fees paid to the recordkeeper from defaulted Plan participants, whereas the more common target-date fund QDIAs are much less expensive for defaulted plan participants.

17.    Prudent fiduciaries would not automatically enroll Plan participants, who tend to be disengaged and do not provide additional personalized information to the recordkeeper, in an expensive MA program when much less expensive target-date funds ("TDFs") for that purpose are readily available.

18.    The vast majority of Bechtel Plan participants who were automatically defaulted into one the Empower MA programs during the Class Period, including the Professional Management Program ("PMP"), did not provide any personalized or demographic information to Empower to customize their managed account program and thus, were enrolled in essentially very expensive and imprudent TDFs.

19.     The unreasonable administrative fees paid by automatically defaulted Plan participant inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan's administrative fees were excessive, unreasonable, and imprudent and that the Plan MA QDIA should have been replaced by a TDF QDIA during the Class Period.

20.     These breaches of fiduciary duty caused Plaintiff and Class Members tens of millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these excessive and unreasonable and excessive administrative fees.

21.     To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION

22.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

23.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

24.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

25.     In conformity with 29 U.S.C. §1132(h), Plaintiff served this Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury

## PARTIES

26.     Plaintiff, Debra D. Hanigan, is a resident of the State of Oregon and currently resides in Port Orford, Oregon, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

27.     Plaintiff was employed by Bechtel from October 2003 to July 2023 in the following positions and locations: (a) Purchasing Specialist and Database Administrator at the Waste Treatment Plant in Richland, Washington, from October 2003 to February 2014; (b) Compliance Specialist and Senior Purchasing Specialist at the Blue Grass Chemical Agent-Destruction Pilot Plant in Richmond, Kentucky, from March 2014 to July 2016; (c) Senior Purchasing Specialist and Compliance Specialist at the Uranium Processing Facility in Oak Ridge, Tennessee, from August 2016 to April 2021; and (d) Senior Purchasing Specialist (remotely) at the Richland, Washington facility, from April 2021 to July 2023. Ms. Hanigan retired from Bechtel in July 2023.

28.     During the Class Period, Plaintiff was automatically defaulted at various times without her consent or instructions into the Plan managed account program, now-called the Empower PMP (subadvised by Financial Engines), which in turn invested her in the International Equity Index Fund, U.S. Small Cap/Mid Cap Equity Index Fund, S&P 500 Index Fund, Bond Fund, Long Duration Bond Index Fund, U.S. Bond Index Fund, and Money Market Fund.

29.     Plaintiff is a current participant in the Bechtel Plan.

30.     Plaintiff was automatically defaulted at least twice into the Empower managed account program during the Class Period without her knowledge and without her consent.

31.     Plaintiff did not fill out any questionnaire to provide personalized information to the Empower managed account program on-line, by phone, or otherwise, about her demographic or financial background.

32.     Plaintiff did not receive any in-person financial planning advice as part of her enrollment in the Empower managed account program during the Class Period.

33.     Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered actual injuries to her Plan account through paying excessive administrative fees during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining the managed account service from Empower and Financial Engines as its QDIA without going through the appropriate fiduciary process to select that service, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and Class.

34.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injuries.

35.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive administrative fees or the fact that the Empower managed account program had been selected as the Plan QDIA) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

36.     Having never managed a massive 401(k) Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable administrative fee levels available to the Plan and did not know the process by which Bechtel chose the Empower managed account program as the QDIA for the Plan.

37.     Bechtel is an engineering, procurement, construction, and project management company founded in San Francisco, California in 1898, and headquartered at 12011 Sunset Hills Road, Reston, Virginia 20190. In this Complaint, "Bechtel" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

38.     Bechtel acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Bechtel and its Board appointed other Plan fiduciaries on the Plan Committee and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.  For these reasons, Bechtel and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

39.     The Plan is administered by the Bechtel Trust and Thrift Plan Committee ("Plan Committee). As the Plan Administrator, the Plan Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

40.     In 2022, the Plan had $5,111,831,764 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had more bargaining power regarding Plan fees and expenses than most other 401(k) plans in the United States. Defendants, however, did not regularly monitor Empower and Financial Engines to ensure that they remained the prudent and objectively reasonable choices to provide RKA services (including MA services for defaulted Plan participants).

41.     With 15,508 participants in 2022, the Plan had more participants than 99.90% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year.

Similarly, with $5,111,831,764 in assets in 2022, the Plan had more assets than 99.97% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year.

## ERISA'S FIDUCIARY STANDARDS

42.     Employers must: (1) establish a prudent process for selecting service providers and reviewing investments; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers and investments once selected to make sure they continue to be prudent choices.

### Qualified Default Investment Alternatives (QDIAs)

43.     Qualified default investment alternatives ("QDIAs") are a legal form of automatic enrollment plan under ERISA. Department of Labor, *Fact Sheet: Default Investment Alternatives Under Participant-Direct Individual Account Plans*, UNITED STATES DEPARTMENT OF LABOR (September 2006), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/default-investment-alternatives-under-participant-directed-individual-account-plans.

44.     The Department of Labor's ("DOL") regulation regarding QDIAs, effective December 24, 2007, provides safe harbor relief from fiduciary liability for investment outcomes to plan sponsors under Section 404(c) of ERISA.

45.     QDIAs allow plan fiduciaries, in the absence of investment direction from the participant, to automatically invest their assets in a default fund or portfolio.

46.     The DOL defines a QDIA as an investment fund or model portfolio that seeks both long-term appreciation and capital preservation through a mix of equity and fixed income investments.

47.    Permissible QDIAs include target date funds (TDFs), MAs, and Balanced Funds. *See* 29 C.F.R. § 2550.404c-5(b)(2).

**Managed Accounts (MAs)**

48.    Managed accounts (MAs) are a discretionary portfolio management service for a fee that makes investment decisions for the participant within the confines of a plan and its fund options.

49.    Most plan participants are expected to receive a TDF-like experience with MAs. *See* Aon, *Are Managed Accounts More Efficient Than Target Date Funds?* (2020).

50.    Many MA providers build simple portfolios with less diversification than the most "vanilla" TDFs. *Id.*

51.    MA portfolios are often meaningfully more expensive and not meaningfully more effectively diversified. There is no meaningful difference in the level or the personalization of the diversification. *Id.*

52.    Recordkeepers can deliver many of the benefits they claim to deliver through managed accounts via other services that are provided as part of the bundled recordkeeping offering for no additional fee. *Id.*

53.    MA fees often account for a significant portion of administrative fees. The portion of MA fees paid to the recordkeeper is often not disclosed transparently.  The lack of transparency makes it hard to determine whether the MA service provides value. *See* Aon, *Can You Truly Evaluate Managed Accounts Through Marketing's Rose-Colored Glasses?* (2019).

54.    For example, Fidelity is one of the largest MAs providers. An analysis of defined contribution plans required to file the Form 5500 from 2014 through 2022 reveals that by the end

of 2014, Fidelity had 686 recordkeeping plans that had adopted its MAs, but by the end of 2022

Fidelity had 2,659 recordkeeping plans that had adopted its MAs, a growth of almost 288%.



55.    In contrast, Fidelity's total growth of recordkeeping clients was just under 38%

over that same period.

56.    Similarly, as illustrated in the graph below, Fidelity's direct compensation per plan

from the subset of 382 Fidelity recordkeeping plans that consistently used its MAs from 2014

through 2022 grew 282%.

57.    In contrast, Fidelity's direct compensation from the subset of 4,515 Fidelity record-

keeping plans that consistently did *not* use its MAs from 2014 through 2022 grew only 145%.

58.    In other words, Fidelity's revenue grew roughly twice as fast among plans using

the MAs compared to those not using the MAs. As a result, Fidelity has had a powerful financial

incentive to sell its managed account services to retirement plan fiduciaries.



59.    As a result, Fidelity, and other recordkeepers like Empower that provide MAs, have a powerful financial incentive to sell their managed account services to retirement plan fiduciaries.

60.    TDFs outperformed MAs in median, upside, and downside cases. *See* Alight Solutions, *2018 Professional Investment Assistance Report: The Impact of Managed Accounts and Target Date Funds in Defined Contribution Plans 2007-2016.*

61.    The top three managed account providers – Fidelity, Financial Engines, and Morningstar – represent 91% of the total managed account market for defined contribution plans. *See* The Cerulli Report, U.S. Retirement Markets 2018.

62.    Empower, the recordkeeper for the Bechtel Plan, provided MA services in the form of the Professional Management Program (PMP) through its subadviser, Financial Engines. This managed account service was previously provided by Empower's Advised Assets Group ("AAG").

63.    Where the recordkeeper is the face of the MA offering to participants, like Empower, the recordkeeper collects fees though various structures, is economically incented to have managed accounts utilized, and revenue received is often 50% or more of participant fees.

64.    Like Fidelity, Empower has a strong financial incentive to sell its MA program to its recordkeeping clients.

65.    For example, as illustrated in the graph below, among a consistent set of Empower's recordkeeping clients with more than $500M in assets from 2016-2021, those clients that used Empower's MA service generated on average *almost five times as much revenue* per participant than those that did not use its MA service.



66.    Moreover, MA fees are in addition to recordkeeping and other plan fees that participants pay but bear no rational relationship to the costs borne by Empower to deliver the MA service.

67.    Participants are responsible for proactively entering data that is key to personalization of MAs and engagement is required for a participant to have any chance at receiving any value from portfolio management with MAs. Yet, Empower's MA service did not result in any material personalization for Bechtel Plan participants to warrant any additional fees.

**Managed Accounts as QDIAs**

68.     MA providers are willing to accept lower fees for plans that offer the MA service as the QDIA (as compared to those plans that do not designate the MA as the QDIA) since more total revenue is generated for MA providers when the MA is the QDIA.

69.     Although the QDIA rule "does not require a plan fiduciary to undertake an evaluation as to which of the [QDIAs] provided for in the regulation is the *most prudent* for a participant or the plan," *see* Final Rule, 72 Fed. Reg. 60452, 60453 (Oct. 24, 2007) (emphasis added), the rule "does not provide relief from the general fiduciary rules applicable to the selection and monitoring of a particular qualified default investment alternative or from any liability that results from a failure to satisfy these duties, including liability for any resulting losses." *Id.*

70.     Between 2014 and 2019, among plans that designated QDIAs, 94% to 97% selected TDFs as their QDIA.  *See* Vanguard, How America Saves 2020.  Managed accounts represented 1% or less of QDIAs during this same period.

71.     Thus, Defendants are required to have utilized a prudent fiduciary process and memorialize why they selected, and then maintained, the Empower PMP over other QDIA alternatives, like TDFs.

72.     Although the Empower PMP does not have to be the "most prudent" QDIA, Final Rule, 72 Fed. Reg. 60452, 60453 (Oct. 24, 2007), the selection of the managed account as the QDIA still has to be prudent itself under general fiduciary standards under ERISA. *Id.*

73.     Under the minimum standard of care for prudent plan fiduciaries, based on the information available prior to and throughout the Class Period, no rational plan fiduciary having

conducted even a cursory analysis could have concluded that it was prudent to utilize an MA service as the QDIA for the Plan.

74.     Given the excessive fees that Defendants agreed to have a large segment of its Plan participants pay for MA services by establishing the Empower managed account as the QDIA, it can be inferred that Defendants did not follow a prudent fiduciary process in selecting the Empower managed account program as the Plan QDIA during the Class Period, thereby causing Bechtel Plan participants to lose tens of millions of dollars in retirement monies during the Class Period.

75.     Had the Plan fiduciaries instead selecting the Plan TDFs as the QDIA, Plan participants would have paid only recordkeeping fees to Empower unless they affirmatively opted-in to receive such MA services.

76.     In other words, the net result of the Defendants' imprudent decisionmaking in making the MA service the Plan QDIA is that, all else being equal, the Plan and the Plan Participants have less money and Empower and Financial Engines earned tens of millions of dollars without providing any benefit or value to the Bechtel Plan and its participants.

## THE PLAN PAID UNREASONABLE ADMINISTRATIVE FEES BASED ON QDIA MANAGED ACCOUNT COMPENSATION

77.     A plan fiduciary must monitor the total administrative fees, including QDIA managed account compensation, it pays to the Plan recordkeeper by regularly conducting an independent evaluation of those fees to ensure that such administrative fees are reasonable and remove the recordkeeper and/or change the QDIA if those fees are unreasonable.

78.     During the Class Period, Defendants egregiously failed to regularly monitor the administrative fees, including the QDIA managed account compensation, paid to Empower and Financial Engines.

15

79.     During the Class Period, Defendants failed to consider other QDIA alternatives to the Empower managed account program, including TDFs that most plans use as QDIAs, in order to avoid having Plan participants pay excessive and unreasonable administrative fees.

80.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable administrative fees (including QDIA managed account compensation) it paid to Empower, and in light of the lack of value of those managed account services given the lack of personalization provided by those Bechtel Plan participants were automatically defaulted into this managed account program.

81.     As set forth in the table below, from the years 2018 through 2022, based upon information provided in Participant Fee Disclosures, Financial Statements, and/or in participant quarterly account statements, the Plan paid an effective average annual rate of $320 per participant for administrative fees (including bundled recordkeeping and administrative ("RKA") fee and QDIA Managed Account Compensation):

**Bundled Recordkeeping and Administration Fees**
**Plus QDIA Managed Account Compensation (Bundled RKA+MA)**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | Average |
|---|---|---|---|---|---|---|
| Participants | 16,598 | 16,570 | 16,170 | 15,509 | 15,508 | 16,071 |
| Est. Bundled RKA+MA Fees | $4,944,765 | $5,255,804 | $5,313,466 | $5,392,174 | $4,803,813 | $5,142,004 |
| Est. Bundled RKA+MA Per Participant | $298 | $317 | $329 | $348 | $310 | $320 |
| Bundled RKA Fees | $476,695 | $475,890 | $464,402 | $372,216 | $372,192 | $432,279 |
| Bundled RKA Fees Per PP | $28.72 | $28.72 | $28.72 | $24 | $24 | $27 |
| Est. Losses | $4,468,070 | $4,779,914 | $4,849,064 | $5,019,958 | $4,431,621 | $4,709,725 |
| Est. Losses Per PP | $269 | $288 | $300 | $324 | $286 | $293 |
| Excessive Fee Multiple | 1037% | 1104% | 1144% | 1449% | 1291% | 1190% |

82.     The table below illustrates the administrative fees paid by other similarly-sized, comparable plans, receiving a materially similar level and quality of administrative services, but having a TDF for their QDIA instead of an MA QDIA like the Bechtel Plan, and having either an opt-in managed account program or no managed account program:

**Comparable Plans' Bundled RKA Fees Plus Managed Account Compensation Based on Publicly Available Information from Participant Fee Disclosures or Financial Statements**

| Plan | Participants | Bundled RKA Fee Plus Managed Account Compensation ($) | Bundled RKA Fee Plus Managed Account Compensation ($) ($/pp) | Recordkeeper |
|---|---|---|---|---|
| Cornerstone Building Brands 401(K) Profit Sharing Plan | 9,384 | $464,818 | $50 | Fidelity |
| Mcleod Health 401K Plan | 10,514 | $536,488 | $51 | Fidelity |
| Consumers Energy Company Employees' Savings Plan | 11,320 | $475,440 | $42 | Fidelity |
| Grant Thornton Llp 401(K) Savings Plan | 13,452 | $551,532 | $41 | Schwab |
| **Bechtel Plan 2021 Bundled RKA Fees Plus Managed Account Fees as QDIA** | **15,509** | **$5,392,174** | **$348** | **Great-West (Empower)** |
| Assurant 401(K) Plan | 16,830 | $572,220 | $34 | Vanguard |
| Sharpsaver Defined Contribution Plan | 17,043 | $723,987 | $42 | Alight |
| Air Liquide & Airgas 401(K) Plan | 19,631 | $647,823 | $33 | T. Rowe Price |

83.    To determine the administrative fees that other comparable plans are paying, Plaintiff considered both the direct and indirect compensation collected as disclosed on participant fee disclosures and financial statements.

84.    The Bechtel Plan's recordkeeping rate was between $24/pp and $29/pp during the relevant Class Period, but the use of the Empower managed account as the Plan QDIA generated an additional $298/pp to $348/pp for Empower and Financial Engines during the Class Period.

85.    If the Bechtel Plan had instead used TDFs as their QDIA and no managed account program, the administrative fee, even with an opt-in MA program, would have been closer to between $24/pp and $29/pp.

86.    Even if the Bechtel had TDFs as their QDIA and an opt-in managed account program, like a number of the comparator plans above, the administrative fees would still have been substantially less as illustrated in the chart in Paragraph 77.

87.    The Bechtel Plan additionally cost its participants on average approximately $4,709,725 per year in additional recordkeeping fees, which equates to on average approximately $293 per participant per year

88.    By using the Empower managed account program instead as the QDIA, the Plan cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $23,555,043:

**Bundled Recordkeeping and Administration Fees**
**Plus QDIA Managed Account Compensation (Bundled RKA+MA)**

|  | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| RKA Direct Compensation | $4,944,765 | $5,255,804 | $5,313,466 | $5,392,174 | $4,803,813 |
| Est. Conservative RKA Indirect Compensation | $0 | $0 | $0 | $0 | $0 |
| Est. Conservative Administrative Credit to | $0 | $0 | $0 | $0 | $0 |
| Est. Conservative Bundled RKA Fees | $4,944,765 | $5,255,804 | $5,313,466 | $5,392,174 | $4,803,813 |
|  |  |  |  |  |  |
| Reasonable Bundled RKA Fees | $476,695 | $475,890 | $464,402 | $372,216 | $372,192 |
|  |  |  |  |  |  |
| Est. Conservative Bundled RKA Losses | $4,468,070 | $4,779,914 | $4,849,064 | $5,019,958 | $4,431,621 |
| Compounding Percentage (Plan Return) |  | 19.37% | 13.47% | 10.54% | -17.09% |
| Est. Conservative Cumulative Bundled RKA Losses | $4,468,070 | $10,113,309 | $16,324,151 | $23,064,261 | $23,555,043 |

89.    During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the total administrative fees it paid to Empower, including QDIA managed account compensation, it would have realized that the Plan was compensating Empower and Financial Engines unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and other Plan participants.

90.     During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Plan administrative fees than they should have been and/or by failing to take effective and timely remedial actions including replacing the imprudent managed account QDIA with a prudent TDF QDIA, Defendants breached their fiduciary duty of prudence to Plaintiff and to other Plan participants, causing tens of millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

## **CLASS ACTION ALLEGATIONS**

91.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action in a representative capacity on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

92.     In acting in this representative capacity, Plaintiff seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the Bechtel Thrift and Trust Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 24, 2018, and running through the date of judgment.

93.     The Class includes over 15,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

94.     There are questions of law and fact common to the two combined Subclasses pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

> a.     Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);
>
> b.     Whether Defendants breached their fiduciary duties to the Plan;

      c.     What are the losses to the Plan resulting from each breach of fiduciary duty; and

      d.     What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

95.     Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

96.     Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because she was a participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

97.     Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

98.     Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the subclasses as a whole.

99.    Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

100.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

101.    The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

102.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

103.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against**
**Defendant Plan Committee – Excessive Administrative Fees)**

104.    Plaintiff restates the above allegations as if fully set forth herein.

105.    Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

106.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

107.    Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting RKA providers that charge objectively reasonable administrative fees and select prudent QDIAs for the Plan.

108.    During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's administrative fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

109.    During the Class Period, Defendant Plan Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's administrative fees (including QDIA managed account compensation) were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

110.    During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Empower, to make sure they were providing the administrative services at reasonable costs, given the highly competitive market surrounding administrative services and the enormous bargaining power the Plan had to negotiate the best fees, and replace the imprudent managed account QDIA with a prudent TDF QDIA.

111.    During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's administrative services, include the managed account QDIA, critically or objectively in comparison to other QDIA options available to the Plan.

112.    Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

113.    As a result of Defendant Plan Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in objectively unreasonable and unnecessary monetary losses.

114.    Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Bechtel Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

### SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff, on behalf of herself and Class, Against
Defendants Bechtel and Board – Administrative Fees)**

115.    Plaintiff restates the above allegations as if fully set forth herein.

116.    Defendants Bechtel and Board had the authority to appoint and remove members or individuals responsible for administrative fees and the Plan's QDIA on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

117.    In light of this authority, Defendants Bechtel and Board had a duty to monitor those individuals responsible for administrative fees and the Plan's QDIA and the related fees on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to

take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

118.    Defendants Bechtel and Board had a duty to ensure that the individuals responsible for administrative fees and the Plan's QDIA possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to administrative fees and the Plan's QDIA fees; and reported regularly to Defendants Bechtel and Board.

119.    The objectively unreasonable and excessive administrative fees paid by the Plan by having Empower's managed account program as the Plan's QDIA inferentially establish that Defendants Bechtel and Board breached their duty to monitor by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for administrative fees and the Plan's QDIA on the Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably administrative fees;

b.    Failing to monitor the process by which the Plan's recordkeeper, Empower, was evaluated and failing to investigate the availability of more reasonably-priced QDIA alternatives with Empower; and

c.    Failing to remove individuals responsible for administrative fees and the Plan's QDIA on the Plan Committee whose performance was inadequate in that these individuals continued to pay the same administrative fees (including QDIA managed account compensation) over numerous years even though the contracted price was imprudent and excessively costly, given the lack of value associated with the Empower managed account programs.

120.    As a consequence of the breach of the duty to monitor the Plan's administrative fees and QDIA, the Plaintiff and Plan participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

121.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Bechtel and Board are liable to restore to the Bechtel Plan all losses caused by their failure to adequately monitor individuals responsible for Plan administrative fees and for the Plan's QDIA on the Plan Committee. In addition, Plaintiff and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D.    An Order compelling Defendants to make good to Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to Plan all losses resulting from paying unreasonable Plan administrative fees (including QDIA managed account compensation), and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring Bechtel to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Bechtel as necessary to effectuate relief, and to prevent Bechtel's unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

Date: May 24, 2024                          Respectfully submitted,

                                            **FITZGERALD HANNA & SULLIVAN, PLLC**

                                            /s/Andrew L. Fitzgerald
                                            Andrew L. Fitzgerald
                                            Virginia State Bar No. 48282
                                            119 Brookstown Avenue, Suite 402
                                            Winston-Salem, NC 27101
                                            Telephone: 336-793-4365
                                            Fax: 336-793-4696
                                            E-Mail: andy@fhslitigation.com

                                            **WALCHESKE & LUZI, LLC**

                                            Paul M. Secunda*
                                            *Pro Hac Vice Motion Pending*
                                            235 N. Executive Dr., Suite 240
                                            Brookfield, Wisconsin 53005
                                            Telephone: (414) 828-2372
                                            Fax: (262) 565-6469
                                            psecunda@walcheskeluzi.com

                                            *Attorneys for Plaintiff and Proposed Class*