**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| DEBRA D. HANIGAN, individually, and a representative of a Class of Participants and Beneficiaries of the Bechtel Trust and Thrift Plan, | Case No: 1:24-cv-00875-AJT-LRV |
| Plaintiff, | |
| v. | **CLASS ACTION AMENDED COMPLAINT FOR CLAIMS UNDER ERISA, 29 U.S.C. § 1132(a)(2)** |
| BECHTEL GLOBAL CORPORATION, BOARD OF DIRECTORS OF BECHTEL GLOBAL CORPORATION, and BECHTEL TRUST & THRIFT PLAN COMMITTEE | |
| Defendants. | |

**CLASS ACTION AMENDED COMPLAINT**

COMES NOW Plaintiff, Debra D. Hanigan ("Plaintiff"), individually and as a representative of a Class of Participants and Beneficiaries of the Bechtel Trust and Thrift Plan (the "Plan" or "Bechtel Plan"), by her counsel, WALCHESKE & LUZI, LLC, and FITZGERALD LITIGATION, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

**<u>INTRODUCTION</u>**

1.      As the Fourth Circuit has maintained, "[t]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are ... the highest known to the law." *Tatum v. RJR Pension Inv. Comm.,* 761 F.3d 346, 356 (4th Cir. 2014).

1

2.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

3.      The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Int'l Edison*, 575 U.S. 523, 529 (2015); *DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 423 (4th Cir.2007) ("The duty of a fiduciary to act with prudence includes a duty to initially determine, and continue to monitor, the prudence of each investment option available to plan participants.").

4.      This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern Univ.*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*").

5.      More specifically, with regard to a Plan's qualified default investment alternative ("QDIA"), the plan fund or service into which plan participants are defaulted if they provide no investment instructions, Plan fiduciaries must "prudently select and monitor any qualified default investment alternative under the plan."

6.      There is no requirement to allege the actual inappropriate fiduciary actions taken because "[i]t would be perverse to require plaintiffs bringing [ERISA] claims to plead facts that remain in the sole control of the parties who stand accused of wrongdoing." See *Braden v, Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

7.      Defendants, Bechtel Global Corporation ("Bechtel"), the Board of Directors of Bechtel Global Corporation ("Board"), and the Bechtel Trust & Thrift Plan Committee ("Plan Committee") (collectively "Defendants"), are fiduciaries under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* as they exercise discretionary authority or discretionary control over the 401(k) defined contribution retirement plan – known as the Bechtel Trust and Thrift Plan (the "Plan" or "Bechtel Plan") – that it sponsors and provides to its employees.

8.      Bechtel and its Board are the Plan Sponsor of the Plan.

9.      Bechtel and its Board assigned Plan administrator fiduciary duties to the Bechtel Trust & Thrift Plan Committee ("Plan Committee") and its individual members.

10.      Plaintiff is a "participant" in the Bechtel Plan under ERISA Section 3(7), 29 U.S.C. § 1002(7).

11.      During the Class Period (May 24, 2018, through the date of judgment), Defendant Plan Committee, as the fiduciary of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached its fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1)(B) by defaulting Plan participants, without a reasonable fiduciary process, into a QDIA managed account ("MA") program, the Professional Management Program ("PMP"),[1] operated by Empower Advisory Group ("EAG"), a wholly-owned subsidiary of the Plan recordkeeper, Empower Annuity Insurance Company of America ("Empower").[2]

---

[1] Neither the "Online Advice," nor the "Mix & Monitor" programs provided by Empower Advisory Group to Bechtel Plan participants are part of this action because neither of those programs were offered on a QDIA-basis to Plan participants.

[2] Empower Advisory Group, LLC ("EAG"), the plan MA provider, is a wholly owned direct subsidiary of Empower Services Holdings US, LLC ("ESH US"), which, in turn, is owned by

3

12.     Defendant Plan Committee selected the PMP MA service as the Plan QDIA even though it knew that having a MA as the QDIA would result in more Plan participants paying the high-cost MA fee to EAG/Empower.

13.     Without additional personalization of information from Plan participants, managed accounts are essentially expensive target-date funds ("TDFs"), focused on the single demographic factor of age. Defaulted Plan participants are disengaged and tend not to enter the necessary personalized information.

14.     Plaintiff also alleges that Defendants Bechtel and its Board violated their fiduciary duty of prudence by failing to monitor the fiduciaries responsible for Plan administrative fees and QDIAs on the Plan Committee.

15.     Setting up MAs as the QDIA, significantly and imprudently increased the administrative fees paid by defaulted Plan participants, whereas the more common TDF QDIAs are much less expensive for defaulted Plan participants and provide similar asset allocations when participants provide no personalized information.

16.     Prudent fiduciaries would not automatically enroll defaulted Plan participants, who tend to be disengaged and do not provide additional personalized information to the recordkeeper, into an high-cost MA program when much less expensive TDFs for that purpose are readily available and widely-used by most plans.

17.     These unreasonable administrative fees paid by defaulted Plan participants inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan's administrative fees were excessive, unreasonable, and imprudent and that

---

Empower Annuity Insurance Company of America ("Empower"), the Plan recordkeeper. EAG is, therefore, not  a separate entity from Empower.

the Plan MA QDIA should have been replaced by a much less expensive TDF QDIA at the start of the Class Period.

18.    These breaches of fiduciary duty caused Plaintiff and Class Members tens of millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these excessive and unreasonable administrative fees associated with the Plan MA QDIA.

19.    To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION

20.    This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

21.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

22.    Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

23.    In conformity with 29 U.S.C. §1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury

**PARTIES**

24.     Plaintiff, Debra D. Hanigan, is a resident of the State of Oregon and currently resides in Port Orford, Oregon, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

25.     Plaintiff was employed by Bechtel, including by a Bechtel affiliate, from October 2003 to July 2023 in the following positions and locations: (a) Purchasing Specialist and Database Administrator at the Waste Treatment Plant in Richland, Washington, from October 2003 to February 2014; (b) Compliance Specialist and Senior Purchasing Specialist at the Blue Grass Chemical Agent-Destruction Pilot Plant in Richmond, Kentucky, from March 2014 to July 2016; (c) Senior Purchasing Specialist and Compliance Specialist at the Uranium Processing Facility in Oak Ridge, Tennessee, from August 2016 to April 2021; and (d) Senior Purchasing Specialist (remotely) at the Richland, Washington facility, from April 2021 to July 2023. Ms. Hanigan retired from Bechtel in July 2023.

26.     During the Class Period, Plaintiff was automatically defaulted at least two times without her consent or instructions into the EAG PMP program: from 2018 through 2020 (at which she opted out), and then she was defaulted again into the PMP without her knowledge starting in 2022.

27.     As part of the PMP MA, Plaintiff has been invested in the International Equity Index Fund, U.S. Small Cap/Mid Cap Equity Index Fund, S&P 500 Index Fund, Bond Fund, Long Duration Bond Index Fund, U.S. Bond Index Fund, and Money Market Fund, and has paid significant additional administrative fees for the unwanted managed account service.

28.     Plaintiff is a current participant in the Bechtel Plan and currently-enrolled in the PMP.

6

29.    Plaintiff has never filled out any questionnaire to provide personalized information to the Empower managed account program on-line, by phone, or otherwise, about her demographic or financial background.

30.    Plaintiff did not receive any in-person financial planning advice, or on the telephone, as part of her enrollment in the EAG PMP during the Class Period.

31.    Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered actual injuries to her Plan account through paying excessive administrative fees during the Class Period through being defaulted in the PMP QDIA. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining the managed account service from EAG as its QDIA without going through the appropriate fiduciary process to select that service, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and Class.

32.    Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injuries.

33.    The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, that the EAG PMP had been selected as the Plan QDIA) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

34.    Having never managed a massive 401(k) Plan like the Bechtel Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable administrative fee levels available to the Plan and did not know the process by which Bechtel chose the EAG PMP as the QDIA for the Plan.

35.    Bechtel is an engineering, procurement, construction, and project management company founded in San Francisco, California in 1898, and headquartered at 12011 Sunset Hills Road, Reston, Virginia 20190. In this Complaint, "Bechtel" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

36.    Bechtel acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Bechtel and its Board appointed other Plan fiduciaries on the Plan Committee and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Bechtel and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

37.    The Plan is administered by the Bechtel Trust and Thrift Plan Committee ("Plan Committee"). As the Plan Administrator, the Plan Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

38.    In 2023, the Plan had $5,691,074,806 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had more bargaining power regarding Plan fees and expenses than most other 401(k) plans in the United States. Defendants, however, did not regularly monitor Empower and EAG to ensure that they remained the prudent and objectively reasonable choices to provide administrative services (including MA services for defaulted Plan participants through EAG PMP).

39.    With 16,145 participants in 2023, the Plan had more participants than 99.91% of the defined contribution plans in the United States that filed 5500 forms for the 2023 Plan year.

Similarly, with $5,691,074,806 in assets in 2023, the Plan had more assets than 99.98% of the defined contribution plans in the United States that filed 5500 forms for the 2023 Plan year.

<b><u>ERISA'S FIDUCIARY STANDARDS</u></b>

40.     Employers must: (1) establish a prudent process for selecting the QDIA for the Plan; (2) ensure that fees paid to service providers for the QDIA are reasonable in light of the level and quality of services provided; and (3) monitor QDIAs once selected to make sure they continue to be prudent choices.

**<u>Qualified Default Investment Alternatives (QDIAs)</u>**

41.     Qualified default investment alternatives ("QDIAs") are a legal form of automatic enrollment plan under ERISA. Department of Labor, *Fact Sheet: Default Investment Alternatives Under Participant-Direct Individual Account Plans*, UNITED STATES DEPARTMENT OF LA-BOR (September 2006), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/default-investment-alternatives-under-participant-directed-individual-account-plans.

42.     The Department of Labor's ("DOL") regulation regarding QDIAs, effective December 24, 2007, provides safe harbor relief from fiduciary liability for investment outcomes to plan sponsors under Section 404(c) of ERISA.

43.     QDIAs allow plan fiduciaries, in the absence of investment direction from the participant, to automatically invest their assets in a default fund or portfolio, such as a MA or a TDF, under a QDIA safe harbor.

44.     The DOL defines a QDIA as an investment fund or model portfolio that seeks both long-term appreciation and capital preservation through a mix of equity and fixed income investments.

45.     Permissible QDIAs include target date funds (TDFs), MAs, and Balanced Funds. *See* 29 C.F.R. § 2550.404c-5(b)(2).

46.     It is well known in the 401(k) plan industry that QDIAs will end up with between 70%-80% of Plan assets given inertia and the lack of engagement of most plan participants.

47.     Nevertheless, QDIA selection and monitoring are subject to the same fiduciary prudence standard as any other investment or service selected and maintained by a 401(k) Plan. "Nothing in [the QDIA final rule] shall relieve a fiduciary from his or her duties under part 4 of title I of ERISA to prudently select and monitor any qualified default investment alternative under the plan." 29 CFR § 2550.404c-5(b)(2).

48.     ERISA plan fiduciaries are afforded relief under the QDIA Final Rule only if they prudently select and monitor the QDIA, and failure to satisfy the duty to properly select and monitor a QDIA could include the liability for any resulting losses.

49.     Under the Final QDIA rules, plan fiduciaries cannot indiscriminately select an authorized type of investment, such as an MA, simply because it qualifies as a type of QDIA. The plan fiduciaries must engage in a prudent process to evaluate different QDIA options and determine which QDIA is most suitable for the plan.

50.     If plan participants are unengaged and not financially literate then it is inappropriate to utilize a managed account service as a QDIA. Unengaged participants are far more likely to not read notices provided, not understand the service, and end up paying an additional fee of which they are largely unaware.

51.     In such cases, managed accounts as a QDIA are inappropriate and a TDF would be the prudent choice for the plan QDIA.

52. Because context matters when considering fiduciary decision-making under ERISA, plan fiduciaries must engage in a prudent fiduciary process consistent with fiduciary standards of prudence to evaluate the appropriateness of each QDIA option for the plan and select the best option given the specific facts and circumstances.

53. Although the Department of Labor's QDIA guidance states that there is no requirement that "a plan fiduciary . . . undertake an evaluation as to which of the [QDIAs] provided for in the regulation is the *most prudent* for a participant or the plan," Final Rule, 72 Fed. Reg. 60452, 60453 (Oct. 24, 2007) (emphasis added), each QDIA must be prudent *separate and independently*.

54. TDFs are the QDIA of choice by almost all very large 401(k) plans like the Bechtel Plan. The Callan Institute 2023 Defined Contribution Trends Survey indicates that plans which include a default investment for non-participant directed monies, ninety-seven percent (97%) do so through a TDF whereas only two percent (2%) utilize a managed account as the QDIA. *See 2023 Callan Defined Contribution Trends Survey*, 54, available at https://www.callan.com/blog-archive/2023-dc-trends-survey/.

55. In the same 2023 report, Callan states that "[t]he fees with managed account services are a frequently cited reason for not offering opt-out enrollment."

56. Given that high fees are the most frequently-cited reason for not implementing managed accounts as an opt-out solution, plans that consider managed accounts as an opt-out solution should be extremely sensitive to fee issues and should ensure they adhere to a comprehensive due diligence process.

**Managed Accounts (MAs)**

57.     Managed accounts (MAs) are a discretionary portfolio management service for a fee that makes investment decisions for the participant within the confines of a plan and its fund options.

58.     Most plan participants are expected to receive a TDF-like experience with MAs. *See* Aon, *Are Managed Accounts More Efficient Than Target Date Funds?* (2020).

59.     Without personalization provided by Plan participants through investment questionnaire or similar mechanisms to customize their portfolios, managed account services like the PMP are fundamentally the same as TDFs, the QDIA favored by almost all large plans.

60.     Many MA providers build simple portfolios with less diversification than the most "vanilla" TDFs. *Id.*

61.     MA portfolios are often meaningfully more expensive and not meaningfully more effectively diversified. There is no meaningful difference in the level or the personalization of the diversification. *Id.*

62.     Recordkeepers can deliver many of the benefits they claim to deliver through managed accounts via other services that are provided as part of the bundled recordkeeping offering for no additional fee, such as auto-escalation or TDFs with multiple glide paths. *Id.*

63.     MA fees often account for a significant portion of administrative fees. The portion of MA fees paid to the recordkeeper is often not disclosed transparently. The lack of transparency makes it hard to determine whether the MA service provides value. *See* Aon, *Can You Truly Evaluate Managed Accounts Through Marketing's Rose-Colored Glasses?* (2019).

64.     For example, Fidelity is one of the largest MAs providers. An analysis of defined contribution plans required to file the Form 5500 from 2014 through 2022 reveals that by the end

of 2014, Fidelity had 686 recordkeeping plans that had adopted its MAs, but by the end of 2022

Fidelity had 2,659 recordkeeping plans that had adopted its MAs, a growth of almost 288%.



65.    In contrast, Fidelity's total growth of recordkeeping clients was just under 38%

over that same period.

66.    Similarly, as illustrated in the graph below, Fidelity's direct compensation per plan

from the subset of 382 Fidelity recordkeeping plans that consistently used its MAs from 2014

through 2022 grew 282%.

67.    In contrast, Fidelity's direct compensation from the subset of 4,515 Fidelity record-

keeping plans that consistently did *not* use its MAs from 2014 through 2022 grew only 145%.

68.     In other words, Fidelity's revenue grew roughly twice as fast among plans using

the MAs compared to those not using the MAs. As a result, Fidelity has had a powerful financial

incentive to sell its managed account services to retirement plan fiduciaries, like Bechtel's Plan

fiduciaries.

13



69.    As a result, Fidelity, and other recordkeepers like EAG that provide MAs, have a powerful financial incentive to sell their managed account services to retirement plan fiduciaries.

70.    Yet, TDFs outperformed MAs in median, upside, and downside cases. *See* Alight Solutions, *2018 Professional Investment Assistance Report: The Impact of Managed Accounts and Target Date Funds in Defined Contribution Plans 2007-2016.*

71.    EAG, the recordkeeper for the Bechtel Plan, provided MA services in the form of the Professional Management Program ("PMP") through its subadviser, Financial Engines. This managed account service was previously provided by Empower's Advised Assets Group ("AAG").

72.    Where the recordkeeper (Empower) is the face of the MA offering to participants (EAG), the recordkeeper collects fees though various structures, is economically incented to have managed accounts utilized, and revenue received is often 50% or more of participant fees.

73.    Like Fidelity, Empower has a strong financial incentive to sell its MA PMP through EAG to its recordkeeping clients.

74.    For example, as illustrated in the graph below, among a consistent set of Empower's recordkeeping clients with more than $500M in assets from 2016-2021, those clients that used EAG's MA PMP generated on average ***almost five times as much revenue*** per participant than those that did not use its MA service.



75.    Moreover, MA fees are in addition to recordkeeping and other plan fees that participants pay, but bear no rational relationship to the costs borne by EAG to deliver the PMP MA service.

76.    Participants are responsible for proactively entering data that is key to personalization of MAs and engagement is required for a participant to have any chance at receiving any value from portfolio management with MAs.

77.    Yet, EAG's PMP service did not result in any material personalization for Bechtel Plan participants, who were overwhelmingly disengaged with regard to their 401(k) Plan, to warrant any additional fees.

15

**Managed Accounts as QDIAs**

78.     EAG's own documents make clear that MA fees associated with the Plan's QDIA are a type of administrative fee, not an investment fee.

79.     In the EAG's explanation of its services to plans, participant advice provided through the PMP is listed separately from investment management services and as a type of usage or "a la carte" fee generally considered a part of recordkeeping and administrative ("RKA") services.

80.     MA providers are willing to accept lower fees for plans that offer the MA service as the QDIA (as compared to those plans that do not designate the MA as the QDIA) since more total revenue is generated for MA providers when the MA is the QDIA.

81.     Between 2014 and 2019, among plans that designated QDIAs, 94% to 97% selected TDFs as their QDIA.  *See* Vanguard, *How America Saves 2020*. Managed accounts represented 1% or less of QDIAs during this same period.

82.     Given the scarcity and high expense associated with MA QDIAs, Defendants must justify this QDIA choice by utilizing a prudent fiduciary process and memorializing through written documentation why they selected, and then maintained, the EAG PMP over other QDIA alternatives, like TDFs or Balanced Funds during the entire Class Period.

83.     Given the excessive fees that Defendants agree to have a large segment of its Plan participants pay for MA services by establishing the EAG PMP account as the QDIA, it can be plausibly inferred that Defendants did not follow a prudent fiduciary process in selecting the Empower managed account program as the Plan QDIA during the Class Period, thereby causing Bechtel Plan participants to lose tens of millions of dollars in retirement monies during the Class Period.

16

84.     This is not to say managed accounts can never be a prudent choice for a Plan QDIA, but there would have to be a different type of Plan population than Bechtel has.

85.     More specifically, if the participant demographics for the plan showed that the majority of participants were engaged with the plan, that they were above average in their financial literacy, and plan fiduciaries had reason to believe that the majority were making informed decisions, then utilizing a managed account as the QDIA may be appropriate.

86.     There are also managed account providers that do not charge additional administrative fees that might be prudently selected as a plan QDIA. Such was not the case here.

87.     Plaintiff herself provides a representative example of many Bechtel employees who are not engaged and do not even know that such a service existed, does not have above average financial literacy, and did not make any informed decisions regarding her participation in the EAG PMP program.

88.     In such circumstances, it was imprudent to have an opt-in MA program as the Bechtel Plan did.

89.     Had the Plan fiduciaries instead selecting the Plan TDFs as the QDIA, Plan participants would have paid only recordkeeping fees to Empower unless they affirmatively opted-in to receive such MA services.

90.     In other words, the net result of the Defendants' imprudent decisionmaking in making the MA service the Plan QDIA is that, all else being equal, the Plan and the Plan Participants have less money and Empower/EAG earned tens of millions of dollars more without providing any benefit or value to most Bechtel Plan participants.

17

## THE PLAN PAID UNREASONABLE ADMINISTRATIVE FEES BASED ON QDIA MANAGED ACCOUNT COMPENSATION

91. A plan fiduciary must monitor the total administrative fees, including QDIA managed account compensation, it pays to the Plan recordkeeper and MA service provider (here one in the same company) by regularly conducting an independent evaluation of those fees to ensure that such administrative fees are reasonable and remove the recordkeeper and/or change the QDIA if those fees are unreasonable or imprudent.

92. During the Class Period, Defendants egregiously failed to regularly monitor the administrative fees, including the QDIA managed account compensation, paid to Empower/EAG.

93. Because EAG is wholly-owned by Empower, they are one in the same company, and fees that are paid to EAG are paid by extension to Empower, who wholly owns EAG.

94. During the Class Period, Defendants failed to consider other QDIA alternatives to the EAG PMP, including TDFs that most plans utilize as their QDIAs, in order to avoid having Plan participants pay excessive and unreasonable administrative fees.

95. Without personalization of MAs provided by Plan participants through investment questionnaires, MAs rely on age primarily just like TDFs, except they are many magnitudes more expensive when it comes to recordkeeping and administrative (RKA) fees.

96. Plaintiff's experience is representative of many participants in the experience who were also defaulted into the PMP in the Bechtel Plan without their knowledge, who did not provide any personalization to customize their MA solution to provide additional value, and did not have the financial literacy to understand they were being charged unnecessary administrative fees in the form of MA QDIA fees without their knowledge, all the while losing retirement monies unnecessarily.

97.     If Bechtel wished to provide the PMP on an opt-in basis, in which Plan participants affirmatively selected EAG to "leave ongoing investment decisions to experienced investment professionals," that would have been more prudent.

98.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable administrative fees (including QDIA managed account compensation) it paid to EAG, and in light of the lack of value of those MA services given the disengaged, financially illiterate, and uninformed nature of most Bechtel Plan participants who were automatically defaulted in the EAG PMP.

99.     The Plan Committee, as Plan fiduciaries, should have compared MAs to TDFs and other qualified QDIAS, through periodic QDIA analyses to determine whether given cost, risk, performance, and other pertinent factors (like defaulted participants' disengagement) whether establishing the EAG PMP as the Plan's QDIA was prudent.

100.    Additionally, most investment management fees contemplated by the DOL regulations are paid as part of the expense ratio of the investment option while MA fees are in addition to those fees and are extracted directly from participant accounts - not as part of the investment expense ratio.

101.    Fidelity, the largest recordkeeper and one of the largest managed account provider, lists managed account fees as a type of "administrative expense," as opposed to "investment expense" on both its 408(b)(2) plan sponsor disclosures and fee transparencies for plans.

102.    In addition to the recordkeeping fee of $24 per participant per year, the PMP costs defaulted Bechtel Plan participants an annual fee of 0.27% of assets under management balances up to $100,000, the next $150,000 is 0.20%, and the annual Program fee for any additional assets is 0.10%.

103.    In comparison, there are no administrative fees associated with TDFs and participants only pay the $24 recordkeeping fee.

104.    All plans, including the comparable plans below, must determine which QDIA option to select: 1) TDF; 2) balanced fund; or 3) MA. A prudent fiduciary needs to evaluate the differences in expected outcomes from each of these alternative options and thus, plan fiduciaries must make a comparison and evaluation of the potential QDIA options.

105.    The appropriate comparison is not managed account versus managed account with regard to a comparison of fees associated with the MAs or services provided by those MAs, but instead whether a TDF should have been selected for the QDIA instead of *any* managed account.

106.    The selection of the MA solution as the QDIA was therefore imprudent without any evidence that a QDIA fiduciary process was followed or that these additional MA fees provided any value to defaulted participants who did not even know they were defaulted into the Plan and who did not provides any personalized information to permit more investment individualization, like Plaintiff.

107.    The comparable plans, which utilized TDFs as the QDIA, are examples of a choice that a prudent fiduciary could have made had they performed the required fiduciary analysis and determined that establishing MAs as the QDIAs with their higher fees was imprudent when TDFs could have provided similar asset allocations as MAs for Plan participants at a much lower cost.

108.    As set forth in the table below, from the years 2018 through 2023, based upon information provided in Participant Fee Disclosures,  Audited Financial Statements attached to 5500 Forms, and/or in participant quarterly account statements, the Bechtel Plan paid an effective average annual rate of $314 per participant for administrative fees (which is the sum of Bundled recordkeeping and administrative ("RKA") fees and QDIA MA compensation):

**Bundled Recordkeeping and Administration Fees**
**Plus QDIA Managed Account Compensation (Bundled RKA+MA)**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Average |
|---|---|---|---|---|---|---|---|
| Participants | 16,598 | 16,570 | 16,170 | 15,509 | 15,508 | 15,670 | 16,004 |
| Est. Bundled RKA+MA Fees | $4,866,422 | $5,177,594 | $5,237,144 | $5,392,174 | $4,803,813 | $4,653,368 | $5,021,753 |
| Est. Bundled RKA+MA Per Participant | $293 | $312 | $324 | $348 | $310 | $297 | $314 |
| Bundled RKA Fees | $398,352 | $397,680 | $388,080 | $372,216 | $372,192 | $376,080 | $384,100 |
| Bundled RKA Fees Per PP | $24 | $24 | $24 | $24 | $24 | $24 | $24 |
| Est. Losses | $4,468,070 | $4,779,914 | $4,849,064 | $5,019,958 | $4,431,621 | $4,277,288 | $4,637,653 |
| Est. Losses Per PP | $269 | $288 | $300 | $324 | $286 | $273 | $290 |
| Excessive Fee Multiple | 1222% | 1302% | 1350% | 1449% | 1291% | 1237% | 1307% |

109.    The table below illustrates the administrative fees paid by other similarly-situated plans, providing a comparable level and quality of administrative services, but who selected a TDF for their QDIA instead of an MA like the Bechtel Plan:

**Comparable Plans' Bundled RKA Fees Based on Publicly Available Information from Participant Fee Disclosures or Audited Financial Statements from 5500 Forms**

| Plan | Partici-pants | Bundled RKA Fee Plus QDIA Man-aged Account Compensation ($) | Bundled RKA Fee Plus QDIA Managed Account Compensa-tion ($) ($/pp) | Recordkeeper | Plan Data Year |
|---|---|---|---|---|---|
| Consumers Energy Company Employ-ees' Savings Plan | 11,320 | $475,440 | $42 | Fidelity | 2021 |
| Linde Retirement Savings Plan | 15,450 | $679,800 | $44 | Fidelity | 2021 |
| **Bechtel Plan 2021 Bundled RKA Fees Plus Managed Account Fees as QDIA** | **15,509** | **$5,392,174** | **$348** | **Great-West (now Em-power)** | **2021** |
| Assurant 401(K) Plan | 16,830 | $572,220 | $34 | Vanguard | 2021 |
| MUFG Union Bank N.A. 401(K) Plan and Trust | 18,670 | $728,130 | $39 | Prudential | 2021 |
| Air Liquide & Airgas 401(K) Plan | 19,631 | $647,823 | $33 | T. Rowe Price | 2022 |

21



110.    In undertaking this analysis, underlying investment fees associated with MAs and TDFs are not taking into account. Only the administrative fee associated with MAs, and the lack of any administrative fees associated with TDFs, are compared.

111.    The comparable plans above are not selected to show that RKA fees are excessive, rather to show that the MA fees as part of the Plan QDIA were unnecessary and unreasonable.

112.    The Bechtel Plan's recordkeeping rate was $24/pp during the relevant Class Period, but the use of the EAG managed account as the Plan QDIA generated an additional $324/pp so that the total was $348/pp for EAG/Empower in 2021.

113.    If the Bechtel Plan had instead used TDFs as their QDIA and no managed account program, the administrative fee, even with an opt-in MA program, would have been closer to $24-$30/pp, assuming opt-in enrollment of 6%, which is the industry average.

114.    The Bechtel Plan additionally cost its participants on average approximately $4,637,653 per year in additional administrative fees, caused by defaulting participants into the PMP, which equates to on average approximately $290 per participant per year.

115.    By using the EAG PMP as the QDIA, instead of TDFs like almost all other Plans did, the Plan cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of **$31,505,610** through December 31, 2023:

**Bundled Recordkeeping and Administration Fees**
**Plus QDIA Managed Account Compensation (Bundled RKA+MA)**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| RKA Direct Compensation | $4,866,422 | $5,177,594 | $5,237,144 | $5,392,174 | $4,803,813 | $4,653,368 |
| Est. Conservative RKA Indirect Compensatic | $0 | $0 | $0 | $0 | $0 | $0 |
| Est. Conservative Administrative Credit to I | $0 | $0 | $0 | $0 | $0 | $0 |
| Est. Conservative Bundled RKA Fees | $4,866,422 | $5,177,594 | $5,237,144 | $5,392,174 | $4,803,813 | $4,653,368 |
| | | | | | | |
| Reasonable Bundled RKA Fees | $398,352 | $397,680 | $388,080 | $372,216 | $372,192 | $376,080 |
| | | | | | | |
| Est. Conservative Bundled RKA Losses | $4,468,070 | $4,779,914 | $4,849,064 | $5,019,958 | $4,431,621 | $4,277,288 |
| Compounding Percentage (Plan Return) | | 19.37% | 13.47% | 10.54% | -17.09% | 15.59% |
| Est. Conservative Cumulative Bundled RKA Losses | $4,468,070 | $10,113,309 | $16,324,151 | $23,064,261 | $23,555,043 | $31,505,610 |

116.    During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the total administrative fees it paid to Empower/EAG, including QDIA managed account compensation, it would have realized that the Plan was compensating Empower/EAG unreasonably and imprudently based on the MA services received, passing on these objectively unreasonable and excessive fee to Plaintiff and other Plan participants.

117.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Plan administrative fees than they should have been and/or by failing to take effective and timely remedial actions including replacing the imprudent managed account QDIA with a prudent TDF QDIA, Defendants breached their fiduciary duty of prudence to Plaintiff and to other Plan participants, causing tens of millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

118.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action in a representative capacity on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

119.    In acting in this representative capacity, Plaintiff seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the Bechtel Thrift and Trust Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 24, 2018, and running through the date of judgment.

120.    The Class includes over 15,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

121.    There are questions of law and fact common to the two combined Subclasses pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

  a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

  b. Whether Defendants breached their fiduciary duties to the Plan;

  c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

  d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

122.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all

24

participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

123. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because she was a participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

124. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

125. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the subclasses as a whole.

126. Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

127. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

128.    The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

129.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

130.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against**
**Defendant Plan Committee – Excessive Administrative Fees)**

131.    Plaintiff restates the above allegations as if fully set forth herein.

132.    Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

133.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

134.    Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting recordkeepers that charge objectively reasonable administrative fees and select prudent QDIAs for the Plan.

135.    During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's administrative fees and QDIA were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

136.    During the Class Period, Defendant Plan Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's administrative fees (including QDIA managed account compensation) were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

137.    During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Empower, to make sure they were providing the administrative services at reasonable levels, and replace the imprudent EAG PMP QDIA with a prudent TDF QDIA.

138.    During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's administrative services, include the EAG PMP QDIA, critically or objectively in comparison to other QDIA options, such as TDFs, available to the Plan.

139.    Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

140.    As a result of Defendant Plan Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in objectively unreasonable and unnecessary monetary losses.

141.    Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Bechtel Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff, on behalf of herself and Class, Against
Defendants Bechtel and Board – Administrative Fees)**

142.    Plaintiff restates the above allegations as if fully set forth herein.

143.    Defendants Bechtel and Board had the authority to appoint and remove members or individuals responsible for administrative fees and the Plan's QDIA on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

144.    In light of this authority, Defendants Bechtel and Board had a duty to monitor those individuals responsible for administrative fees and the Plan's QDIA and the related fees on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

145.    Defendants Bechtel and Board had a duty to ensure that the individuals responsible for administrative fees and the Plan's QDIA possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on

28

which they based their decisions and analysis with respect to administrative fees and the Plan's

QDIA fees; and reported regularly to Defendants Bechtel and Board.

146.    The objectively unreasonable and excessive administrative fees paid by the Plan by

having EAG's PMP as the Plan's QDIA inferentially establish that Defendants Bechtel and Board

breached their duty to monitor by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for administrative fees and the Plan's QDIA on the Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably administrative fees;

b.    Failing to monitor the process by which the Plan's recordkeeper, Empower, was evaluated and failing to investigate the availability of more reasonably-priced QDIA alternatives; and

c.    Failing to remove individuals responsible for administrative fees and the Plan's QDIA on the Plan Committee whose performance was inadequate in that these individuals continued to pay the same administrative fees (including QDIA MA compensation) over numerous years even though the contracted price was imprudent and excessively costly, given the lack of value associated with the EAG PMP.

147.    As a consequence of the breach of the duty to monitor the Plan's administrative

fees and QDIA, the Plaintiff and Plan participants suffered tens of millions of dollars of objectively

unreasonable and unnecessary monetary losses.

148.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Bechtel and Board

are liable to restore to the Bechtel Plan all losses caused by their failure to adequately monitor

individuals responsible for Plan administrative fees and for the Plan's QDIA on the Plan Commit-

tee. In addition, Plaintiff and the Class are entitled to equitable relief and other appropriate relief

as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims

and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D. An Order compelling Defendants to make good to Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to Plan all losses resulting from paying unreasonable Plan administrative fees (including QDIA managed account compensation), and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An Order requiring Bechtel to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Bechtel as necessary to effectuate relief, and to prevent Bechtel's unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H. An award of pre-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J. Such other and further relief as the Court deems equitable and just.

Date: August 6, 2024

Respectfully submitted,

**WALCHESKE & LUZI, LLC**

***/s/ Paul M. Secunda***
Paul M. Secunda (admitted pro hac vice)
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
Fax: (262) 565-6469
psecunda@walcheskeluzi.com

**FITZGERALD LITIGATION**

Andrew L. Fitzgerald
119 Brookstown Avenue, Suite 402
Winston-Salem, NC 27101
Telephone: 336-793-4365
Fax: 336-793-4696
E-Mail: andy@fitzgeraldlitigation.com

*Attorneys for Plaintiff and Proposed Class*

31